UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO.: _____

MINDY LEE,

    Plaintiff,

v.

HERNANDEZ CONSTRUCTION, LLC
and STILES CORPORATION

    Defendants.
_____/

**COMPLAINT AND DEMAND FOR JURY TRIAL**

Plaintiff, MINDY LEE, by and through her undersigned counsel, sues the Defendants, HERNANDEZ CONSTRUCTION, LLC and STILES CORPORATION and alleges as follows:

**JURISDICTION AND VENUE**

1.    This is an action for damages and to remedy violations of the rights of MS. LEE under the Americans with Disabilities Act of 1990, as amended, including the ADA Amendment Act of 2008 ("ADA") and the Florida Private Sector Whistleblower Act, Fla. Stat. § 448.102 ("FPSWA") to redress injuries done to her by the Defendants, HERNANDEZ CONSTRUCTION, LLC and STILES CORPORATION.

2.    The unlawful acts which gave rise to this Complaint occurred within Broward County, Florida during the Plaintiff's employment with Defendants, making venue proper in this District pursuant to 28 U.S.C. § 1391.

**PARTIES**

3.    At all times material hereto, Plaintiff has been a citizen and resident of Broward County, Florida and is otherwise *sui juris*.

1

4. At all times material hereto, Defendant, Hernandez Construction, LLC ("Defendant HCO"), has been a Florida limited liability company with its principal place of business in Broward County, Florida.

5. At all times material hereto, Defendant, Stiles Corporation ("Defendant Stiles"), has been a Florida corporation with its principal place of business in Broward County, Florida.

6. At all times material hereto, Defendant Stiles commonly controlled the day-to-day operations of Defendant HCO and shared an interest in making profits through the operation of Defendant HCO.

7. At the relevant time, Plaintiff was an individual with an association with someone with a disability – specifically, her child - and, as such, Plaintiff is a member of a protected class under the ADA and Chapter 760 because the terms, conditions, and privileges of her employment were altered because of her association with someone with a disability.

8. As an individual with first amendment rights, Plaintiff is a member of a protected class under the FPSWA because the terms, conditions, and privileges of her employment were altered because Plaintiff voiced her objection to the illegal activities committed by the Defendants.

9. Defendants are not government agencies. At all times material hereto, Defendants were Plaintiff's employer as defined by law.

10. Defendants have, at all times material hereto, employed 20 or more employees for each working day in each of twenty or more calendar weeks in the current or preceding year in accordance with the ADA and FPSWA.

11. Plaintiff has exhausted her administrative remedies by filing a timely charge of discrimination against the Defendants with the Equal Employment Opportunity Commission, which was dually filed with the Florida Commission on Human Relations.

12. Plaintiff's charge was filed within 300 days after the first instance of discrimination occurred.

13. Plaintiff was issued a Notice of Right to Sue on December 8, 2021. This suit is filed in accordance with that Notice and within the applicable ninety (90) day limitation (a copy of the Notice is attached hereto as Exhibit "A").

14. The Florida Commission on Human Relations did not issue a finding on Plaintiff's charge within 180 days of the filing of said charge.

**GENERAL ALLEGATIONS COMMON TO ALL COUNTS**

15. Defendant HCO hired Plaintiff on November 18, 2019 as an Executive P.A. and shortly thereafter the Plaintiff also became the Office Manager. In her roles, Plaintiff reported directly to Alex Hernandez, CEO of Defendant HCO.

16. As the Executive P.A./Office Manager, Plaintiff's primary duties and responsibilities included assisting the CEO in both his business and personal life as well as running the day-to-day office administration.

17. Plaintiff was qualified for her positions as Executive P.A. and Office Manager based on her experience and training.

18. After the onset of the Covid-19 global pandemic, the Defendants discriminated against the Plaintiff based on her association with her daughter – a disabled person - and terminated the Plaintiff in retaliation for complaining about the discrimination.

19. On Sunday, February 23, 2020, Mr. Hernandez sent the Plaintiff a text message asking her to immediately find a flight out of Italy and into Florida for his girlfriend, Ms. Tamara Kuligina. Ms. Kuligina resided in Milan and was originally scheduled to travel from Milan on February 28, 2020. However, she told Mr. Hernandez that due to an outbreak of Covid-19 in

Milan, the airports were shutting down. Mr. Hernandez told the Plaintiff to get Ms. Kuligina out on the next available flight. The Plaintiff was concerned that Ms. Kuligina could be infected and contagious, so she objected. Mr. Hernandez reassured the Plaintiff that Ms. Kuligina had no symptoms and that she had self-quarantined in Italy and was doing fine.

20. Ms. Kuligina flew into Florida on February 23, 2020 and stayed with Mr. Hernandez at his residence. At work, Defendant HCO's employees told Mr. Hernandez that Ms. Kuligina needed to self-quarantine and that Mr. Hernandez should stay out of the office. Mr. Hernandez ignored these concerns, telling everyone that she was fine and showed no symptoms.

21. On February 26, 2020, Mr. Hernandez called the Plaintiff into his office and asked her to find a location where Ms. Kuligina could get tested for Covid-19. The Plaintiff told him that there were no testing facilities yet. The Plaintiff started calling around and, based on the information she obtained, suggested that Mr. Hernandez take Ms. Kuligina to urgent care to see if she could obtain test there. He also asked the Plaintiff to research options for health insurance for Ms. Kuligina. The Plaintiff asked Mr. Hernandez if Ms. Kuligina was sick. He responded that Ms. Kuligina was not sick but since she was going to be in Florida for a while, he wanted her to have health insurance. He then reiterated that he wanted Ms. Kuligina to be tested for Covid-19. The Plaintiff told him that she did not know where they were testing and, since he said she was not showing symptoms, it was unlikely she could obtain a test. The Plaintiff again asked if Ms. Kuligina was having symptoms and Mr. Hernandez said no.

22. That same day, Mr. Hernandez told the Plaintiff to notify his ex-wife that he wanted to reschedule the custody arrangements for their two minor children so that the children would stay with his ex-wife and then come to him in two weeks. Mr. Hernandez said that he did not want his children around Ms. Kuligina right now.

4

23. That same day, Mr. Hernandez asked the Plaintiff to contact some elder living facilities because he wanted to move his mother from her current facility. The Plaintiff made arrangements for Mr. Hernandez to visit Atria Willow Wood on February 27, 2020.

24. On February 28, 2020, Mr. Hernandez brought Ms. Kuligina to the office building because she was enrolling in a nearby language school. Mr. Hernandez told the Plaintiff that, starting on Monday, March 2, 2020, the Plaintiff was required to drive Ms. Kuligina from his house and to the school for her language classes. The Plaintiff told him that she was not comfortable with this assignment because Ms. Kuligina had obviously been exposed in Italy and it was unclear whether or not she was positive and contagious. Mr. Hernandez ignored the Plaintiff's concerns and told her that since the Plaintiff drove by his home daily, she was required to drive Ms. Kuligina to class. He reassured the Plaintiff that Ms. Kuligina was fine and not sick and showed no symptoms

25. Later that day Plaintiff spoke with Mr. Don Woods, Senior Vice President of Defendant HCO, about Mr. Hernandez's requiring Plaintiff to drive Ms. Kuligina and that Plaintiff did not want to do so, particularly because of the risks to her disabled daughter. He responded that he agreed and that Mr. Hernandez made "a bad business decision" bringing Ms. Kuligina and possibly infecting employees and business associates. Mr. Woods told the Plaintiff that he was going to speak to Mr. Hernandez and tell him that having Plaintiff drive Ms. Kuligina was not a good idea, and that, instead, Ms. Kuligina and Mr. Hernandez should be staying home and quarantining for at least 14 days.

26. Later that day, Mr. Woods told the Plaintiff that he spoke with Mr. Hernandez, but that Mr. Hernandez insisted Ms. Kuligina was not sick. Mr. Woods told the Plaintiff that she had no choice but to drive Ms. Kuligina.

27. As directed, Plaintiff drove Ms. Kuligina to her language class every day until March 13, 2020. Each morning, the Plaintiff asked Ms. Kuligina how she was feeling and if she had any symptoms. Each morning, Ms. Kuligina said that she felt fine.

28. The week of March 9, 2020, Mr. Hernandez received an email from Stiles Construction stating that if anyone had traveled to or had contact with anyone from the known hotspots (e.g. China, Italy, Iran, etc.), then that person needed to notify human resources immediately. The email went on to explain that, if anyone was sick, that individual should stay home and quarantine. After reading the email, the Plaintiff told Mr. Hernandez that he needed to tell human resources that Ms. Kuligina had just come from one of these hotspots. Mr. Hernandez said "absolutely not" and that he did not want to talk about it again. He said he did not want human resources to know that Ms. Kuligina had just arrived from Italy.

29. Right after employees received the email, Mr. Woods texted the Plaintiff a link to a website explaining that anyone coming from a hot spot should self-isolate for a minimum of 14 days. The Plaintiff told Mr. Woods that he needed to send the link to Mr. Hernandez since Mr. Hernandez said he would not discuss it again.

30. On March 10 or 11, 2020, the Plaintiff picked up Ms. Kuligina and noticed she had a tissue in her hand and was blowing her nose. She also sounded like she was sick. The Plaintiff asked her if she was sick and she said that she was not. After dropping her off, the Plaintiff told Mr. Woods that she suspected Ms. Kuligina was sick because she was exhibiting symptoms. Mr. Woods responded that he would speak with Mr. Hernandez. Mr. Woods was also concerned for his own health since he was over 65 years old. He mentioned his concerns to the Plaintiff daily for about two weeks.

31. On Friday March 13, 2020, when the Plaintiff picked up Ms. Kuligina, Ms. Kuligina informed the Plaintiff that she would no longer be attending school and that this was the Plaintiff's last day driving her. Later that day, Mr. Hernandez told the Plaintiff to pick Ms. Kuligina up at 1 p.m. and bring her to LA Fitness and he would pick her up from there.

32. Also, on Friday, March 13, 2020, Mr. Hernandez told all employees that they had to take their laptops home and be prepared to work from home in the event that the Defendants shut down the offices. Mr. Woods told the Plaintiff that the building management said they were running out of supplies in the rest rooms and were worried about people coming into work sick.

33. On March 16, 2020, Mr. Hernandez called the Plaintiff as she was on her way to work and asked her to research the protocol for people who called in sick and may have Covid-19. He informed the Plaintiff that two field employees called in sick with low-grade fevers. He said one of his fears was that people would pretend to be sick in order to get paid time off. The Plaintiff told him that she doubted anyone would lie about having the virus considering how serious it was and that people were dying. After the Plaintiff spoke to Mr. Hernandez, she realized that she did not have her laptop with her. The Plaintiff had just received the laptop from IT on March 13, 2020 and was not used to having a laptop with her. The Plaintiff turned around and headed back home to grab the laptop. The Plaintiff called Mr. Woods and told him that she was running a little late.

34. When the Plaintiff got to work, the other employees were discussing their concerns about the two people who called out sick and whether or not they had caught Covid-19 and whether they had gotten it from Mr. Hernandez. They were telling the Plaintiff that she should be concerned because she had been in regular and direct contact with Ms. Kuligina for two weeks. The Plaintiff was very concerned and spoke with Mr. Woods about whether or not the two field employees who called out sick had come into contact with Mr. Hernandez in the past week or two. He responded

7

in the affirmative. The Plaintiff told Mr. Woods that Mr. Hernandez wanted her to research what the protocol was if employees became sick. Mr. Woods reiterated that Mr. Hernandez should never have brought his girlfriend and that by doing so he was putting everyone's lives in jeopardy. Mr. Woods said that Ms. Kuligina needed to go get tested and he was researching to find a place where Ms. Kuligina could get tested.

35. Later that day, Mr. Hernandez came in to work and asked the Plaintiff why she was late, and she explained that she left her laptop at home, and she could have either come in without it or turned around to go get it. Since Mr. Hernandez needed the Plaintiff to do research, she knew she needed the laptop, so she turned back to get it. The Plaintiff told him that she had informed Mr. Woods that she was running late.

36. Mr. Hernandez asked the Plaintiff what she was able to find out from her research on what to do if someone was sick. The Plaintiff told him that if someone was sick and had symptoms then they needed to see their doctor and get a note to be tested and that they should self-quarantine for 14 days. The Plaintiff told him that they would have to tell their doctor that they came into contact with someone from a hot zone. The Plaintiff told Mr. Hernandez that they would have to give Ms. Kuligina's name. Mr. Hernandez told the Plaintiff that she was not to bring up Ms. Kuligina and not to tell people they have been in contact with her. Mr. Hernandez said he did not want to hear the Plaintiff bring her name up again. The Plaintiff objected and told him that she was only telling him this so that he understood the protocol.

37. That afternoon the Plaintiff went to lunch and, upon returning, she began to feel chills and her face felt flushed. Mr. Woods said, "you don't look right." The Plaintiff thought it was just what she had eaten for lunch. Mr. Woods joked and said that maybe the Plaintiff had

Covid-19 that she caught from Mr. Hernandez's girlfriend. The Plaintiff told him not to joke about that and that if the Plaintiff had Covid-19 then everyone at the workplace probably had it.

38.     The Plaintiff went home, and she started to feel even worse. The Plaintiff had a fever and began having severe breathing issues and felt tightness in her chest. The Plaintiff called Broward Health and told them the symptoms she was experiencing. They told the Plaintiff not to go to the hospital, and that she was presumptive-positive and should self-isolate and only go to the hospital if her symptoms were becoming life threatening. The Plaintiff texted Mr. Hernandez and asked him how he was feeling and told him that she had a fever. Mr. Hernandez claimed that he and Ms. Kuligina were feeling fine.

39.     The next day, March 17, 2020, the Plaintiff texted back and forth with Mr. Hernandez. The Plaintiff told him that there was one place that was doing testing, but that Broward Health was telling her that she could not be tested. The Plaintiff explained that Ms. Kuligina could be tested since she came from a hot spot and was the likely source of Plaintiff's possible infection. He told the Plaintiff that Mr. Woods told him about a place in Miramar that was doing testing. The Plaintiff explained that Broward Health was saying that the Plaintiff was not eligible, and the Plaintiff again mentioned that only Ms. Kuligina could get tested. The Plaintiff explained that she was not concerned about dying as she was in good health but she was more concerned because this virus could kill her daughter. The Plaintiff told him that he and Ms. Kuligina needed to get tested. The Plaintiff provided the contact information for the testing place and explained that since Ms. Kuligina came from Italy, she would be able to be tested. The Plaintiff sent Mr. Hernandez a screenshot of her doctor's prescription saying that she was exposed to someone who came from Italy. The Plaintiff told him that he did not need a doctor's prescription since Ms. Kuligina came from a hotspot.

9

40. Later that evening, the Plaintiff saw a news story that a resident at Atria Willow Wood nursing home having died from Covid-19 and that the county was looking into how Covid-19 entered this nursing home. This was the same nursing home where the Plaintiff had made an appointment for Mr. Hernandez to visit. The Plaintiff tried to call Mr. Hernandez but he did not pick up. The Plaintiff sent him a text telling him that the nursing home he visited two weeks prior had a resident who die from Covid-19. The Plaintiff again asked Mr. Hernandez to get Ms. Kuligina tested because so many lives were at stake.

41. On March 18, 2020, the Plaintiff texted Mr. Hernandez and told him that she was still trying to get tested and she had contacted her daughter's doctor stating how urgent it was that they get tested. The Plaintiff told him her symptoms were the same, not getting better but not getting worse. The Plaintiff told him that the hospitals said she could only come in if she or her daughter were in critical condition, and at that point it could be too late. Mr. Hernandez never responded to the Plaintiff's messages.

42. Around noon, Mr. Woods and Mr. Fabio DasCola, Defendant HCO's Chief Financial Officer, called Plaintiff and informed her that Mr. Hernandez decided to terminate her employment. The Plaintiff asked why, and Mr. Woods said that it was because the Plaintiff was late on Monday and that Mr. Hernandez did not believe the Plaintiff when she said she had gone home to get her laptop. The Plaintiff said, "that is a bunch of crap. I am being fired because I am home sick, possibly with coronavirus that his girlfriend infected me with and that I am insisting that she needs to go get tested because I can't get tested. This is why I am being fired now. It has nothing to do with me being late days ago." The Plaintiff also mentioned that she was being fired for telling Mr. Hernandez that people he came into contact with at the nursing home were dying.

43. In all the months that the Plaintiff was employed for the Defendants, the Defendants never told the Plaintiff to report to work by a specific time. In fact, many mornings, the Plaintiff was running around doing personal errands for Mr. Hernandez and was rarely the first one into the office. The opening of the office was a shared responsibility between Mr. Woods, the Plaintiff, Mr. James Markis, and Renee. The four of them were to cover the opening of the office. The Plaintiff regularly stayed late at the office to complete her work. This meant that the Plaintiff spent longer days at the office than most other employees. At no time was there any indication that Mr. Hernandez was not happy with the Plaintiff's performance.

44. The Defendants discriminated and retaliated against the Plaintiff based on her association with someone with a disability.

45. The Plaintiff filed a complaint with OSHA on April 3, 2020.

46. Plaintiff has engaged the undersigned attorney to prosecute her claims and is entitled to recover her attorney's fees from Defendants pursuant to statute.

**COUNT I: VIOLATION OF THE AMERICANS WITH DISABILITIES ACT OF 1990 ("ADA")**
**(Discrimination on the basis of association with someone with a disability)**

47. Plaintiff incorporates herein the allegations contained in paragraphs 1 through 46, inclusive, as though same were fully re-written here.

48. The ADA forbids discrimination based on disability and/or discrimination based on association with someone with a disability, prohibiting discrimination in employment, public services, public accommodations, and telecommunications.

49. Plaintiff has an association with someone with a disability as those terms are defined under the ADA, and, therefore, is a member of the protected class.

50. At all times relevant hereto, Defendants regarded Plaintiff as an individual associated with someone with a disability.

51. At the time of the unlawful discrimination and ultimate termination, Plaintiff did perform and excel at the performance of the essential functions assigned to her by Defendants.

52. Plaintiff was qualified for the position.

53. Defendants are large institutions, and therefore are sophisticated employers who have actual knowledge of the requirements of the ADA, as amended.

54. The failure of Defendants to adhere to the mandates of the ADA was willful and their violations of the provisions of the ADA were willful.

55. The Defendants termination of the Plaintiff demonstrates the Defendants lack of adherence to their policy against discrimination and failure to comply with the law on disabilities.

56. Because the Plaintiff was associated with someone with a disability, Defendants, through their employees terminated the Plaintiff.

57. Any allegedly nondiscriminatory reason for the Defendants' termination of Plaintiff's employment is a mere pretext for the actual reasons for Defendants' termination of Plaintiff; inter alia Plaintiff's association with someone with a disability.

58. Upon information and belief, the Defendants allow employees to have associations with others as long as their associates, even if they are family, do not have a disability.

59. As a result of Defendants' violation, Plaintiff has suffered damages.

60. As a direct and proximate result of the intentional and discriminatory acts and practices of the Defendants, and/or their employees, Plaintiff suffered injury and continues to suffer injury, including past and future loss of income and other employment benefits, emotional

pain and suffering, humiliation, loss of enjoyment of life, embarrassment, damage to her reputation, and other past and future pecuniary losses.

61. Defendants' actions were malicious and were recklessly indifferent to Plaintiff's rights protecting persons from discrimination and termination due to her association with someone with a disability.

WHEREFORE, Plaintiff hereby requests this Court grant Plaintiff judgment against Defendants to compensate her for past and future pecuniary losses, including back pay, front pay, lost benefits, compensatory damages, injury to her professional reputation, emotional pain and suffering for the embarrassment, anxiety, humiliation, and emotional distress caused by Defendants discriminatory treatment, and punitive damages in an amount to be determined at trial and in accordance with the ADA; attorney's fees, costs, prejudgment and post judgment interest, and such other and further relief as this Court deems just and appropriate.

## COUNT II: VIOLATION OF ADA
### (Retaliation)

62. Plaintiff incorporates herein the allegations contained in paragraphs 1 through 46, inclusive, as though same were fully re-written here.

63. Plaintiff had as association with someone with a disability as that term is defined under the ADA.

64. At all times relevant hereto, Defendants regarded Plaintiff as an individual with an association with someone with a disability.

65. Defendants are employers as that term is defined under the ADA.

66. Due to Plaintiff's association with someone with a disability, and Plaintiff's numerous objections to and complaints about the potential harm to her disabled child, the Defendants retaliated against her by terminating her employment.

13

67. As a result of Defendants violation, Plaintiff has suffered damages.

68. Defendants' actions were malicious and were recklessly indifferent to Plaintiff's rights protecting persons from discrimination due to her association with someone with a disability.

69. As a direct and proximate result of the intentional and discriminatory acts and practices of the Defendants, and/or its employees, Plaintiff suffered injury and continues to suffer injury including past and future loss of income and other employment benefits, emotional pain and suffering, humiliation, loss of enjoyment of life, embarrassment, damage to her reputation, and other past and future pecuniary losses.

WHEREFORE, Plaintiff hereby requests this Court grant Plaintiff judgment against Defendants to compensate her for past and future pecuniary losses, including back pay, front pay, lost benefits, compensatory damages, injury to her professional reputation, emotional pain and suffering for the embarrassment, anxiety, humiliation, and emotional distress caused by Defendants discriminatory treatment, and punitive damages in an amount to be determined at trial and in accordance with the ADA; attorney's fees, costs, prejudgment and post judgment interest, and such other and further relief as this Court deems just and appropriate.

### COUNT III: VIOLATION OF THE FLORIDA PRIVATE SECTOR WHISTLEBLOWER ACT

70. Plaintiff incorporates herein the allegations contained in paragraphs 1 through 46, inclusive, as though same were fully re-written here.

71. The FPSWA provides that an employer may not take any retaliatory personnel action against an employee because the employee has: (1) disclosed, or threatened to disclose, to any appropriate governmental agency, under oath, in writing, an activity, policy, or practice of the employer that is in violation of a law, rule, or regulation; (2) provided information to, or testified

14

before, any appropriate governmental agency, person, or entity conducting an investigation, hearing, or inquiry into an alleged violation of a law, rule, or regulation by the employer; (3) objected to, or refused to participate in, any activity, policy, or practice of the employer which is in violation of a law, rule, or regulation. § 448.102, Fla. Stat.

72. Plaintiff objected to the illegal activities committed by the Defendants.

73. At all relevant and material times, Defendants failed to comply with the FPWSA.

74. At all times relevant, including at the time of the unlawful termination, Defendants were aware that Plaintiff had objected to the illegal activities committed by the Defendants.

75. At the time of the unlawful termination, Plaintiff did perform and excel at the performance of the essential functions assigned to her by Defendants.

76. Plaintiff was highly qualified for the position and Defendants retaliated against her only because she objected to the illegal activities committed by the Defendants.

77. Defendants are large privately-owned businesses, and therefore sophisticated employers who have knowledge of the FPWSA.

78. The failure of Defendants to adhere to the mandates of the FPWSA was willful.

79. Defendants, through their practices and policies as employers, willfully, and with malicious or reckless disregard of Plaintiff's protected rights through the State of Florida, retaliated against Plaintiff because she objected to the illegal activities committed by the Defendants in violation of the FPWSA with respect to their decision to terminate the Plaintiff.

80. Plaintiff's termination from employment was directly and proximately caused by Defendants retaliating against the Plaintiff for objecting to the illegal activities committed by the Defendants.

81. As a direct and proximate result of Defendants' intentional conduct, Plaintiff has suffered serious economic losses including back pay, front pay, and compensatory damages.

82. Pursuant to the FPWSA Plaintiff is entitled to costs of this action and reasonable attorney's fees.

WHEREFORE, Plaintiff hereby requests this Court grant Plaintiff judgment against Defendants \ to compensate her for past and future pecuniary losses, including back pay, front pay, lost benefits, compensatory damages, injury to her professional reputation, emotional pain and suffering for the embarrassment, anxiety, humiliation, and emotional distress caused by Defendants discriminatory treatment, and punitive damages in an amount to be determined at trial; attorney's fees, costs, prejudgment and post judgment interest, and such other and further relief as this Court deems just and appropriate

## DEMAND FOR JURY TRIAL

Plaintiff demands a trial by jury on all issues so triable.

Respectfully submitted this 28th day of February, 2022

By: /s/ *Michelle Cohen Levy*
Michelle Cohen Levy, FBN 0068514
The Law Office of Michelle Cohen Levy, P.A.
4400 N. Federal Highway
Lighthouse Point, Florida 33064
P: (954) 651-9196
Michelle@CohenLevyLegal.com
Counsel for Plaintiff